KAVANAUGH, Circuit Judge,
dissenting as to jurisdiction and not deciding the merits:
The Affordable Care Act is unusually significant federal legislation that will affect all Americans. One provision of the Act requires most Americans to maintain health insurance or else pay a tax penalty when they file their annual tax returns. That provision — commonly referred to as the individual mandate — is codified in the Tax Code and takes effect in 2014. The tax penalty for those without health insurance is capped at the average price of a health insurance plan. The tax penalty is the only sanction for failing to have health insurance. And the IRS — and only the IRS — may assess, collect, and enforce the tax penalty.
Plaintiffs contend that Congress lacks constitutional authority to mandate that citizens purchase health insurance. The Government responds that Congress possesses the requisite authority under the Commerce and Necessary and Proper Clauses of Article I, Section 8 of the Constitution. The Government alternatively asserts that this provision creates nothing more than a routine tax incentive authorized by the Taxing Clause of Article I, Section 8.
For judges, there is a natural and understandable inclination to decide these weighty and historic constitutional questions. But in my respectful judgment, deciding the constitutional issues in this case at this time would contravene an important and long-standing federal statute, the Anti-Injunction Act, which carefully limits the jurisdiction of federal courts over tax-related matters.
Enacted in 1867, the Anti-Injunction Act, with a few exceptions, denies courts jurisdiction over pre-enforcement suits that would restrain “the assessment or collection of any tax.” 26 U.S.C. § 7421(a). The Supreme Court has strictly interpreted that Act as a firm bulwark against premature judicial interference with tax assessment and collection. As the Court has stressed time and again, although the Act may seem an inconvenient technicality in the context of a particular case, it is essential to the overall system of orderly and prompt federal tax administration.
*22 Under the Anti-Injunction Act, a taxpayer seeking to challenge a tax law must first pay the disputed tax and then bring a refund suit, at which time the courts will consider the taxpayer’s legal arguments. Or a taxpayer may raise legal arguments in defending against an IRS enforcement action. But a taxpayer may not bring a pre-enforcement suit. In this case, the individual mandate takes effect in 2014, so taxpayers without health insurance must start paying tax penalties on their tax returns in 2015. The Anti-Injunction Act means, therefore, that a suit challenging the individual mandate cannot be entertained until 2015, unless Congress acts before then to exempt these suits from the Act.
The Anti-Injunction Act applies here because plaintiffs’ pre-enforcement suit, if successful, would prevent the IRS from assessing or collecting tax penalties from citizens who do not have health insurance. To be sure, the Affordable Care Act labels its exaction for failure to have health insurance as a tax “penalty” and not as a “tax.” But the Anti-Injunction Act still applies. That’s because the Affordable Care Act requires that the tax penalty for failure to maintain health insurance “be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68” of the Tax Code. 26 U.S.C. § 5000A(g)(l). And penalties under subchapter B of chapter 68 in turn must “be assessed and collected in the same manner as taxes.” 26 U.S.C. § 6671(a) (emphasis added). It follows from those two provisions, taken together, that these Affordable Care Act penalties must be assessed and collected “in the same manner as taxes.” Taxes are insulated from pre-enforcement suits by the Anti-Injunction Act. In order for the Affordable Care Act penalties to be assessed and collected “in the same manner as taxes,” the assessment and collection of these Affordable Care Act penalties likewise must be insulated from pre-enforcement suits by the Anti-Injunction Act.
That straightforward chain of logic convincingly demonstrates that the Anti-Injunction Act poses a jurisdictional bar to our deciding this case at this time.
Moreover, there is an alternative and independent reason that the Anti-Injunction Act applies here. Section 6201 of the Tax Code defines the IRS’s authority for assessment and collection of taxes to include assessment and collection of the civil penalties in the Tax Code that are assessed by the IRS — what are statutorily known as “additional amounts,” “additions to the tax,” and “assessable penalties.” Section 6201 specifically requires the IRS to assess “all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title.” 26 U.S.C. § 6201(a); see 26 U.S.C. §§ 6301-6303 (collection). The Affordable Care Act imposes a civil “penalty” for failure to have health insurance; the penalty is to be “assessed” by the IRS; and it is to be assessed “in the same manner as an assessable penalty under subchapter B of chapter 68.” The Affordable Care Act penalty is therefore an “assessable penalty” for purposes of Section 6201. Under Section 6201, it is also, then, a tax for purposes of the IRS’s assessment authority. The Anti-Injunction Act in turn bars pre-enforcement suits to restrain assessment or collection of taxes. Because Section 6201 classifies the Affordable Care Act penalty as a tax for assessment and collection purposes, it follows that the Anti-Injunction Act bars pre-enforcement suits to restrain the assessment or collection of the Affordable Care Act penalty.
That reasoning independently demonstrates that the Anti-Injunction Act pre *23 eludes us from deciding this case at this time.
In sidestepping the Anti-Injunction Act, the majority opinion relies heavily on the fact that Congress used the word “penalty” rather than “tax” in the Affordable Care Act. But the majority opinion’s surface appraisal fails to take account of the basic text and structure of the Tax Code. The Tax Code contains numerous penalties for violations of requirements set forth in the Code. Congress often uses the “penalty” label so as to have a greater coercive effect on behavior that Congress wants to encourage or discourage. But critical for present purposes (and overlooked by the majority opinion) is that the Tax Code equates tax penalties to taxes for numerous administrative purposes, including for assessment and collection by the IRS. Here, the text of the Tax Code establishes both that the Affordable Care Act penalty must be “assessed and collected in the same manner as taxes” (Section 6671) and that the Affordable Care Act penalty is a “tax” for purposes of the IRS’s assessment power (Section 6201). By equating tax penalties to taxes for these purposes, each provision independently makes clear that these Affordable Care Act penalties, like taxes, are insulated from pre-enforcement suits by the Anti-Injunction Act.
The Tax Code is never a walk in the park. But the statutory analysis here leads to a firm conclusion that the Anti-Injunction Act bars this suit.
The fact that the Tax Code equates tax penalties to taxes for IRS assessment and collection purposes is known by Members of Congress who work on tax-related legislation — in particular, the Members and staff of the Senate Finance Committee and the House Ways and Means Committee. Those Members and staff are likewise familiar with the Anti-Injunction Act. Those Tax Code specialists, and their counterparts in the Executive Branch, were deeply involved in crafting the Affordable Care Act. Over the years, Congress has carved out many exceptions to the Anti-Injunction Act to permit pre-enforcement challenges to tax laws, particularly in situations where delay would cause disruption or hardship. In this Act, moreover, Congress specifically relieved taxpayers from certain enforcement mechanisms that the IRS ordinarily may employ to enforce tax obligations. But Congress did not relieve taxpayers from the Anti-Injunction Act’s bar against pre-enforcement suits. We must respect Congress’s decision. Unless Congress creates an exception for these Affordable Care Act cases — which Congress could still do at any time — this suit cannot be decided by the federal courts until 2015.
Notwithstanding the text of the Anti-Injunction Act, some have argued that compelling prudential considerations demand that the courts decide this constitutional issue now. But prudential considerations cannot trump the text of a statute setting forth limits on a court’s jurisdiction. , In any event, in my judgment, the relevant prudential considerations favor our waiting until 2015.[1]
I
The Affordable Care Act was passed by Congress and signed into law by President Obama on March 23, 2010. The Act initiated a series of major changes to the *24 American health insurance and health care markets.
Although the following is an over-simplification, the Act’s most important provisions are five: (1) an increase in federal spending, including through Medicaid, on health care for lower-income families and individuals; (2) the creation of state-run “exchanges” designed to help individuals without employer-provided or other health insurance obtain insurance more easily and cheaply than they can now on the open market; (3) a requirement that most employers provide health insurance to their employees or pay higher taxes than they otherwise would; (4) banning insurers from denying coverage or charging higher rates to individuals with pre-existing conditions or health problems; and (5) a mandate that most citizens maintain health insurance or else pay a tax penalty on their tax returns.
Plaintiffs take exception to that last element: the mandate that individuals maintain health insurance or else pay a tax penalty on their tax returns. Plaintiffs argue that Congress lacks authority to impose such a mandatory-purchase requirement under the Commerce Clause, the Necessary and Proper Clause, or the Taxing Clause, which are the constitutional bases cited by the Government to justify the mandate. Plaintiffs point out that a federal mandatory-purchase requirement is unprecedented in American history. Although some States have imposed similar mandates for their citizens to maintain health insurance or auto insurance, for example, plaintiffs explain that the Federal Government does not possess a general police power over its citizens and has not previously employed such mandates.
A
The Tax Code is codified in Title 26 of the United States Code. (The terms “Tax Code,” “Internal Revenue Code,” and “Title 26” are synonymous.) Title 26 contains 11 subtitles, which in turn are subdivided into chapters numbered 1 through 100.
Within Title 26 is Subtitle D, which is entitled “Miscellaneous Excise Taxes.” Within Subtitle D is chapter 48, which is entitled “Maintenance of Minimum Essential Coverage.” Within chapter 48 is Section 5000A, which is entitled “Requirement to maintain minimum essential coverage” and contains the individual mandate provision at issue in this case.
Section 5000A provides in relevant part:
(a) Requirement to maintain minimum essential coverage. — An applicable individual shall for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential coverage for such month.
(b) Shared responsibility payment.—
(1) In general.- — -If a taxpayer who is an applicable individual, or an applicable individual for whom the taxpayer is liable under paragraph (3), fails to meet the requirement of subsection (a) for 1 or more months, then, except as provided in subsection (e), there is hereby imposed on the taxpayer a penalty with respect to such failures in the amount determined under subsection (c).
(2) Inclusion with return. — Any penalty imposed by this section with respect to any month shall be included with a taxpayer’s return under chapter 1 for the taxable year which includes such month.
Section 5000A further provides that the amount of the tax penalty is capped at the average price of a health insurance plan. The section also specifies who is covered and who is exempt. For example, lower- *25 income individuals and illegal aliens are not required to pay a penalty for failing to have health insurance.
Importantly, Section 5000A(g)(l) sets forth how the tax penalties will be assessed, collected, and paid:
The penalty provided by this section shall be paid upon notice and demand by the Secretary, and except as provided in paragraph (2), shall be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68.[2]
As explained more fully below, the cross-referenced provision — subchapter B of chapter 68 — in turn provides that tax penalties “shall be assessed and collected in the same manner as taxes.” 26 U.S.C. § 6671(a) (emphasis added).
To promote compliance with the individual mandate, Congress did not enact criminal penalties enforceable by the Department of Justice. Nor did Congress impose civil penalties enforceable through civil or administrative complaints brought by the Department of Justice or the Department of Health and Human Services, for example. Instead, Congress established a tax penalty that is codified in the Tax Code, paid on individual tax returns, and assessed, collected, and enforced by the IRS.[3] And most importantly for present purposes, Congress employed cross-references making clear that the penalty must be “assessed and collected in the same manner as taxes.”
By requiring that the Affordable Care Act penalties be assessed and collected in the same manner as taxes, Section 5000A(g)(l) triggers the threshold question before us: Do we have jurisdiction to hear this pre-enforcement suit in light of the Anti-Injunction Act, which states that “no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court”?
B
Enacted in 1867, the Anti-Injunction Act bars pre-enforcement challenges to tax laws, subject to certain statutory exceptions not relevant here. The Act requires a taxpayer who objects to a tax law to first pay the tax and then assert his or her legal objections in a suit for refund. See 26 U.S.C. §§ 7421(a), 7422. Alternatively, a taxpayer may raise legal arguments in defense of non-payment during a deficiency or enforcement proceeding. But a taxpayer may not bring a pre-enforcement suit.
As legal challenges to the Affordable Care Act’s individual mandate first popped up in district courts around the country, the Executive Branch initially took the position that the suits were all barred by the Anti-Injunction Act. Indeed, by my count, the Executive Branch told 10 separate district courts that the Anti-Injunction Act barred these cases. The Executive Branch argued that the courts could not decide the constitutionality of the Affordable Care Act’s individual mandate un *26 til 2015 (in tax refund or enforcement suits after the mandate has taken effect).
The Executive Branch later changed its mind about the Anti-Injunction Act, however, presumably because of an understandable policy desire to have courts resolve the constitutional question about the individual mandate sooner rather than later.
That said, courts cannot avoid the Anti-Injunction Act. As the Supreme Court has long and repeatedly held, the Anti-Injunction Act is jurisdictional. Jurisdiction goes to a court’s authority to decide a case, and courts must consider jurisdictional issues even when the defendant does not raise them. See Arbaugh v. Y & H Corp., 546 U.S. 500, 506-07, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006).[4]
Because the Anti-Injunction Act is jurisdictional, courts must apply the Act even when the Executive Branch affirmatively waives or does not assert it, and even when the parties, jointly ask the courts to decide the relevant merits issues immediately. See Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 5, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962) (“The object of § 7421(a) is to withdraw jurisdiction from the state and federal courts to entertain suits seeking injunctions prohibiting the collection of federal taxes.”); id. at 7, 82 S.Ct. 1125 (“Otherwise, the District Court is without jurisdiction, and the complaint must be dismissed.”).
The text of the Anti-Injunction Act manifests its jurisdictional status. The Act says that “no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court.” As the Supreme Court has explained, statutes like the Anti-Injunction Act that govern “a court’s adjudicatory capacity” or that “speak to the power of the court rather than to the rights or obligations of the parties” are jurisdictional. See Henderson ex rel. Henderson v. Shinseki, — U.S. —, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159 (2011); Reed Elsevier, Inc. v. Muchnick, — U.S. —, 130 S.Ct. 1237, 1243, 176 L.Ed.2d 18 (2010) (citation and internal quotation marks omitted).[5]
Moreover, when “a long line of this Court’s decisions left undisturbed by Congress has treated a similar requirement as jurisdictional, we will presume that Congress intended to follow that course.” Henderson, 131 S.Ct. at 1203 (citation and internal quotation marks omitted). That interpretive principle certainly applies here: Since the Anti-Injunction Act’s enactment in 1867, the Supreme Court has consistently ruled that the Act is jurisdictional. See Jefferson County v. Acker, 527 U.S. 423, 434, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999) (“The federal statute Congress had in plain view was an 1867 measure depriving courts of jurisdiction over suits brought ‘for the purpose of restraining the assessment or collection’ of any federal tax.”); Bob Jones Univ. v. Simon, 416 U.S. 725, 749-50, 94 S.Ct. 2038, 40 L.Ed.2d 496 *27 (1974) (affirming Fourth Circuit’s holding that the District Court lacked jurisdiction under the Anti-Injunction Act); Enochs v. Williams Packing, 370 U.S. at 5, 82 S.Ct. 1125 (“The object of § 7421(a) is to withdraw jurisdiction from the state and federal courts to entertain suits seeking injunctions prohibiting the collection of federal taxes.”); Dodge v. Osborn, 240 U.S. 118, 119, 122, 36 S.Ct. 275, 60 L.Ed. 557 (1916) (affirming dismissal of suit to enjoin assessment and collection of taxes on jurisdictional grounds); Brushaber v. Union Pacific Railroad Co., 240 U.S. 1, 10, 36 5.Ct. 236, 60 L.Ed. 493 (1916) (discussing inapplicability of the Anti-Injunction Act in order to “put out of the way a question of jurisdiction”); see also Snyder v. Marks, 109 U.S. 189, 194, 3 S.Ct. 157, 27 L.Ed. 901 (1883) (referring to the “government” and not the Executive Branch alone in saying that the Anti-Injunction Act was “enacted under the right belonging to the government to prescribe the conditions on which it would subject itself to the judgment of the courts in the collection of its revenues”); Cheatham v. United States, 92 U.S. 85, 88-89, 23 L.Ed. 561 (1876) (same).[6]
What is more, the Executive Branch itself agrees that the Anti-Injunction Act is jurisdictional. It is true that the Executive Branch now argues that the Act does not bar suits involving the tax penalties at issue in this case. But the Executive Branch has not suggested that the Court can skip the Anti-Injunction Act question altogether and proceed directly to the Commerce and Taxing Clause issues. Indeed, the Executive Branch has expressly rejected that proposition and has recently reaffirmed its position that the Anti-Injunction Act is jurisdictional. See Reply Brief for United States at 2-3, Dep’t of Health & Human Services v. Florida, No. 11-398 (U.S. Oct. 26, 2011).
The jurisdictional status of the Anti-Injunction Act reflects the Constitution’s separation of powers in operation. Under the Constitution, Congress possesses the power to tax and spend, as well as the power of the purse over appropriations of money. Congress zealously guards those prerogatives. Here, Congress has not afforded discretion to the Executive Branch to waive or forfeit the Anti-Injunction Act’s bar with respect to the assessment and collection of taxes. Rather, by making the Anti-Injunction Act jurisdictional, Congress has commanded courts to abide by the Act even when the Executive Branch might not assert it. Congress has thereby ensured that the flow of revenue is not interrupted by litigation.
Therefore, even when the Executive Branch does not assert or affirmatively tries to waive the Anti-Injunction Act, we cannot overlook it. To do otherwise would *28 contravene the basic separation of powers tenets that underlie jurisdictional principles. When Congress has established a jurisdictional limit on the courts’ power, especially in cases involving monies due to the Federal Government, it would be inconsistent with our constitutional structure for a court to grant the Executive Branch authority to waive or forfeit that jurisdictional limitation.
In a drive-by attempt to crack the solid wall of precedent holding that the Anti-Injunction Act is jurisdictional, some have cited Helvering v. Davis, 301 U.S. 619, 639-40, 57 S.Ct. 904, 81 L.Ed. 1307 (1937). But that case involved a suit by a shareholder against a private corporation, not against the Government. The case shows simply that the Anti-Injunction Act does not necessarily apply in private litigation between a corporation and its shareholders. See Brief for United States at 29 n. 18, Alexander v. “Americans United” Inc., 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974) (No. 72-1371) (similarly describing Helvering v. Davis ).[7] That scenario obviously does not encompass this case. In any event, even if this jurisdictional bar were relaxed when the Executive Branch affirmatively waived the Act, the Executive Branch has recently reiterated to the Supreme Court that it has not asserted, and will not assert, any Helvering v. Davis-based waiver in these cases. See Reply Brief for United States at 6, Dep’t of Health & Human Services v. Florida, No. 11-398. As revealed by the many Supreme Court cases before and since that have described the Anti-Injunction Act as jurisdictional, the Court’s 1937 Helvering v. Davis decision did not undermine the jurisdictional status of the Act.
The majority opinion nominally acknowledges that we must address the Anti-Injunction Act but says we should defer to the Executive Branch’s analysis of why the Act does not apply. The majority opinion cites no relevant authority suggesting that courts should defer to the Executive Branch’s interpretation of jurisdictional statutes such as the Anti-Injunction Act. Not even the Executive Branch has argued that it should receive such deference. The majority opinion’s approach appears to be nothing more than a roundabout way of saying that courts can essentially pass over the Anti-Injunction Act when the Executive Branch claims the Act does not bar a suit. That approach is functionally equivalent to saying that the Act is not jurisdictional. But that’s incorrect. We must independently analyze the Act, and we cannot just defer to the Executive’s interpretation of it.
In sum, the Anti-Injunction Act is jurisdictional. The text of the Act speaks to the power of the courts, which means it is jurisdictional. And the Supreme Court has repeatedly held that the Act is jurisdictional. We therefore must address the Anti-Injunction Act.[8]
*29 II
A
To determine whether the Anti-Injunction Act bars this suit at this time, we start with the text of the Act:
Except as provided in sections 6015(e), 6212(a) and (c), 6213(a), 6225(b), 6246(b), 6330(e)(1), 6331(i), 6672(c), 6694(c), and 7426(a) and (b)(1), 7429(b), and 7436, no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.
26 U.S.C. § 7421(a) (emphasis added). The Supreme Court has repeatedly held that the Act bars pre-enforcement challenges to tax laws. The Court has interpreted “the principal purpose of this language to be the protection of the Government’s need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference, and to require that the legal right to the disputed sums be determined in a suit for refund.” Bob Jones Univ. v. Simon, 416 U.S. 725, 736, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974) (internal quotation marks omitted).[9] By preventing pre-enforcement suits, the Act assures the United States of “prompt collection of its lawful revenue.” Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). A “collateral objective” of the Act, the Court has said, is “protection of the collector from litigation pending a suit for refund.” Bob Jones, 416 U.S. at 737, 94 S.Ct. 2038 (citation and internal quotation marks omitted).[10]
Of course, the exaction in this particular case is statutorily labeled as a Tax Code “penalty,” not a “tax.” Does the Anti-Injunction Act still apply? Yes, as we learn from a straightforward reading of the cross-references in the relevant statutory provisions. (I caution the reader that some of the following is not for the faint of heart.)
The majority opinion places heavy rhetorical reliance on the fact that Congress labeled the individual mandate provision as a “penalty” and not a “tax.” That is a red herring. Congress often chooses the label “penalty” instead of “tax” because the “penalty” label suggests violation of a legal rule and thus has a more powerful effect in altering underlying behavior that Con *30 gress wants to encourage or discourage.[11] Congress thus has created numerous Tax Code civil penalties that apply when a taxpayer fails to comply with legal requirements set forth in the Code. See, e.g., 26 U.S.C. § 527(j)(l) (penalty for failure of political organization to make required disclosures); 26 U.S.C. § 6672 (penalty for willful failure to meet requirement to collect, truthfully account for, and pay over tax); 26 U.S.C. § 6723 (penalty for failure to make timely report of information).
At the same time, the Tax Code is loaded with provisions that treat those Tax Code penalties as taxes for various administrative purposes, including for assessment, collection, and payment. See, e.g., 26 U.S.C. §§ 6665(a), 6671(a).[12] The majority opinion’s fixation on the “penalty” label causes it to neglect the basic text and structure of the Tax Code. The question here cannot be resolved without examining whether this is one of the places in the Tax Code that requires tax “penalties” to be treated as “taxes.” Contrary to the suggestión in the majority opinion, the fact that the exaction here is labeled as a “penalty” only begins the Anti-Injunction Act analysis; it does not end it.
To begin, all agree that the Anti-Injunction Act would bar this suit if the individual mandate provision of the Affordable Care Act were either (i) labeled as a “tax” or (ii) labeled as a “penalty” but codified in chapter 68 subchapter B of the Tax Code. Subchapter B of chapter 68 is entitled “Assessable Penalties.” Section 6671 provides that chapter 68 subchapter B penalties are to be “assessed and collected in the same manner as taxes.”
The analytical question in this case arises because the exaction associated with the individual mandate of the Affordable Care Act is labeled as a “penalty” but is codified not in chapter 68 of the Tax Code, but rather in chapter 48 of Subtitle D, which is entitled “Miscellaneous Excise Taxes.”[13] For that reason, some have *31 been misled into assuming that the Anti-Injunction Act does not apply to the Affordable Care Act’s penalty for failure to have health insurance. That is a mistake, however, because the Affordable Care Act’s individual mandate provision cross-references chapter 68. In particular, Section 5000A provides that the Affordable Care Act’s penalties for failing to have health insurance must be assessed and collected in the same manner as chapter 68 subchapter B penalties. Those chapter 68 subchapter B penalties in turn must be assessed and collected in the same manner as taxes.
The relevant language of the Affordable Care Act states:
The penalty provided by this section shall be paid upon notice and demand by the Secretary, and except as provided in paragraph (2), shall be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68.
26 U.S.C. § 5000A(g)(l) (emphasis added). The cross-referenced provision — chapter 68 subchapter B — in turn states in relevant part:
The penalties and liabilities provided by this subchapter shall be paid upon notice and demand by the Secretary, and shall be assessed and collected in the same manner as taxes. Except as otherwise provided, any reference in this title to “tax” imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.
26 U.S.C. § 6671(a) (emphasis added).
When we put those two sections together, we see that these Affordable Care Act penalties must be assessed and collected in the same manner as taxes. To be sure, Congress carefully avoided the dreaded T-word (“tax”) in the Affordable Care Act’s mandate provision itself, Section 5000A. Instead, Section 5000A cross-references chapter 68 subchapter B, which in turn says assessable penalties “shall be assessed and collected in the same manner as taxes.” 26 U.S.C. § 6671(a).
But as we learn in logic class, when A=B and B=C, then A=C. So it is here: The Affordable Care Act requires that its penalty “be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68,” and chapter 68 subchapter B penalties in turn must be “assessed and collected in the same manner as taxes.” It follows that these Affordable Care Act penalties must be assessed and collected in the same manner as taxes.
Turning back, then, to the Anti-Injunction Act: That Act refers specifically to “the assessment or collection of any tax,” and it requires that taxes be assessed and collected without pre-enforcement judicial interference. It follows that these Affordable Care Act penalties — which, as we have determined, must be “assessed and collected in the same manner as taxes”— likewise must be assessed and collected without pre-enforcement judicial interference. Otherwise, one could not say that the Affordable Care Act penalties were being assessed and collected in the same manner as taxes, as the statute requires.
To conclude that the Anti-Injunction Act does not apply here, one would have to say that a tax that may be challenged in pre-enforcement suits is “assessed and collected in the same manner” as a tax that is insulated from pre-enforcement suits. Such an argument is implausible and untenable, for three main reasons.
*32 First, when the Anti-Injunction Act applies, it bars pre-enforcement suits — that is, taxpayer suits before the tax is assessed and collected. In those situations, the tax is typically collected by the IRS when the taxpayer submits his or her tax return, see 26 U.S.C. §§ 6151, 6201, 6202, 6302, and thus before the taxpayer brings a lawsuit challenging the tax and seeking a refund. If the Anti-Injunction Act did not apply, however, the taxpayer could sue to block assessment and collection of the tax and refuse to pay the tax on his or her tax return. The taxpayer in that latter circumstance would generally pay any tax only after the litigation concluded. So as a temporal and practical matter, a tax is typically assessed and collected by the IRS much earlier' — namely, before any lawsuit — when the Anti-Injunction Act applies. Two taxes are not assessed and collected in the same manner when they are assessed and collected years apart, and when one is assessed and collected by the IRS before any litigation, whereas the other is assessed and collected by the IRS only after the completion of litigation.
After all, the timing of tax assessment and collection is critical to tax collection generally, see, e.g., 26 U.S.C. § 6151, and to the Anti-Injunction Act in particular. Two of the main statutory duties imposed on taxpayers are to file a tax return on time and to pay the tax liability on time. The whole theory of the Anti-Injunction Act rests on the fact that there is a significant difference for purposes of the Government’s tax assessment and collection efforts between a tax assessed and collected in Year 1 and a tax assessed and collected in Year 2, for example. See Bob Jones, 416 U.S. at 747, 94 S.Ct. 2038 (“powerful” government interest in “protecting the administration of the tax system from premature judicial interference”). That explains why the Supreme Court has described the objective of the Act as ensuring “prompt collection” of revenue, not merely eventual collection of revenue. Enochs v. Williams Packing, 370 U.S. at 7, 82 S.Ct. 1125. So it would be rather odd to turn around here and say that temporal differences are irrelevant and that two taxes assessed and collected years apart are in fact “assessed and collected in the same manner.”
Second, the difference is not just the timing of assessment and collection, but also the means of assessment and collection. When the Anti-Injunction Act applies, a tax will generally be assessed and collected by the IRS with submission of the taxpayer’s tax return. See 26 U.S.C. §§ 6151, 6201, 6301, 6302. By contrast, if the Anti-Injunction Act did not apply, a tax could be assessed and collected only after the litigation was resolved in favor of the IRS (if it was resolved in favor of the IRS), by means of a payment to the IRS in the wake of the court order. A tax assessed and collected by the IRS with a taxpayer’s tax return and a tax assessed and collected by the IRS not with the tax return but rather following a court order cannot persuasively be characterized, in my judgment, as being “assessed and collected in the same manner.”
In that regard, keep in mind that the individual tax return is absolutely central to the IRS’s assessment and collection of taxes. Tax returns are the means by which most taxpayers self-assess and pay their taxes, and the means by which much of the Government’s tax revenue is collected.[14] The tax return thus forms the foun *33 dation of the IRS’s assessment and collection process. A method of tax assessment and collection in which the IRS cannot rely on the individual tax return to assess and collect a tax but instead must engage in litigation to win the right to assess and collect a tax is a significantly different manner of assessment and collection — particularly when conceivably multiplied millions of times over for each affected individual tax return. Taxes assessed and collected through these two widely divergent methods cannot reasonably be said to be “assessed and collected in the same manner.” See United States v. American Friends Service Committee, 419 U.S. 7,10, 95 S.Ct. 13, 42 L.Ed.2d 7 (1974) (referring to withholding as method of collection and saying that Anti-Injunction Act applies even when only one method of collection of taxes would be restrained by a suit).[15]
Third, when the Anti-Injunction Act applies, the tax will be collected by the IRS and will be repaid to the taxpayer only if the taxpayer succeeds in the subsequent refund lawsuit. However, if the Anti-Injunction Act did not apply and the taxpayer succeeded in the pre-enforcement lawsuit, the tax would never be collected by the IRS at all. I find it quite difficult to say that a tax that is assessed and collected by the IRS but then returned to the taxpayer some years later is “assessed and collected in the same manner” as a tax that is never assessed or collected by the IRS at all. Common sense tells us that those two scenarios are not equivalent in *34 terms of their manner of assessment and collection.
The distinction is no mere technicality. If the IRS can be deprived of expected revenues by the mere filing of a lawsuit ($4 billion annually in this instance), then the Government will face increased short-term budgetary problems and potentially higher near-term deficits, as well as greater difficulties in planning for future appropriations. The Anti-Injunction Act was designed in part to alleviate those problems. Finding a tax that is collected now to be equivalent to a tax that is never collected thus thwarts the Act’s central design.
In short, the Affordable Care Act dictates that its penalties be assessed and collected in the same manner as chapter 68 subchapter- B penalties. Chapter 68 sub-chapter B penalties in turn must be assessed and collected “in the same manner as taxes.” Taxes are insulated from preenforcement suits by the Anti-Injunction Act. In order for the Affordable Care Act’s penalties to be assessed and collected in the same manner as the chapter 68 sub-chapter B penalties and thus in the same manner as taxes, the Affordable Care Act’s penalties likewise must be insulated from pre-enforcement suits by the Anti-Injunction Act.[16]
Absent any statutory cross-references or definitions, the term “tax” in the Anti-Injunction Act might not itself cover the tax penalties at issue here. But the Affordable Care Act’s cross-reference to chapter 68 establishes that these tax penalties — like the tax penalties in chapter 68 — must be “assessed and collected in the same manner as taxes.” Because of the cross-reference, and because taxes subject to pre-enforcement suits are not assessed and collected in the same manner as taxes insulated from pre-enforcement suits, the Anti-Injunction Act bars us from exercising jurisdiction over this case.[17]
*35 B
In arguing that the Anti-Injunction Act does not apply here, the majority opinion relies in part on a strained interpretation of Section 6671(a) of chapter 68 subchapter B.
Recall that Section 5000A provides that Affordable Care Act penalties for those without health insurance must be assessed and collected in the same manner as penalties under chapter 68 subchapter B, which in turn must be assessed and collected in the same manner as taxes. The relevant cross-referenced provision in chapter 68 subchapter B is Section 6671(a), which states:
The penalties and liabilities provided by this subchapter shall be paid upon notice and demand by the Secretary, and shall be assessed and collected in the same manner as taxes. Except as otherwise provided, any reference in this title to “tax” imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.
The first sentence of Section 6671(a) is key for purposes of the Affordable Care Act’s cross-reference and for my analysis above that the Anti-Injunction Act applies here. The Affordable Care Act and the first sentence of Section 6671(a) together mean that the Affordable Care Act’s penalties for failure to have health insurance must be assessed and collected in the same manner as taxes. As explained above, these tax penalties (in chapter 68 and thus also in the Affordable Care Act) can be assessed and collected in the same manner as taxes only if they are insulated from pre-enforcement suits under the Anti-Injunction Act, as taxes are.
The majority opinion focuses on the second sentence of Section 6671(a). The second sentence equates the penalties in chapter 68 subchapter B to taxes for all Tax Code purposes. As the majority opinion states, that second sentence therefore appears to independently make the Anti-Injunction Act applicable to chapter 68 subchapter B penalties. The majority opinion also states that the second sentence of Section 6671(a) — unlike the first sentence — does not apply to the Affordable Care Act’s penalties. From that, however, the majority opinion draws the incorrect conclusion that the Anti-Injunction Act does not apply to- the Affordable Care Act’s tax penalties.
The majority opinion’s focus on the second sentence of Section 6671(a) is a diversion. As explained above, Section 6671(a)’s first sentence on its own dictates that the Anti-Injunction Act applies to chapter 68 subchapter B penalties — and thus also to the Affordable Care Act’s individual mandate penalties, which must be assessed and collected in the same manner as chapter 68 subchapter B penalties.
*36 Indeed, when the Government initially told district courts around the country that the Anti-Injunction Act barred these suits, it too relied on the first sentence of Section 6671(a). See Memorandum in Support of United States’ Motion to Dismiss at 15, Mead v. Holder, 766 F.Supp.2d 16 (D.D.C.2011) (No. 1:10-cv-950) (“It does not matter whether the payment sought to be enjoined is labeled a ‘penalty’ rather than a ‘tax.’ With exceptions immaterial here, the penalty is ‘assessed and collected in the same manner’ as other assessable penalties under the Internal Revenue Code, I.R.C. § 5000A(g)(l), and, like these other penalties, falls within the bar of the AIA. I.R.C. § 6671(a).”) (some citations omitted).[18]
The second sentence of Section 6671(a), to which the majority opinion points, applies to more than just assessment and collection of taxes. That sentence equates chapter 68 subchapter B penalties to taxes for the full panoply of rights and obligations under the Tax Code. The second sentence thus gives taxpayers numerous rights with respect to imposition of chapter 68 subchapter B tax penalties that taxpayers possess with respect to imposition of taxes — to take just one example, the right to bring a civil action for damages against an IRS employee who violates any Tax Code provision in collecting a tax. 26 U.S.C. § 7433(a).
To be sure, the second sentence of Section 6671(a) is so broadly written that it arguably also makes chapter 68 subchapter B penalties equivalent to taxes for purposes of assessment and collection— which the first sentence specifically accomplishes. The majority opinion finds that redundancy problematic. But such redundancy is not unusual. It is common, after all, for a list of specific statutory requirements or prohibitions to accompany a general statutory requirement or prohibition that encompasses the specific.[19]
*37 Focusing on the plain text, as we must: The Affordable Care Act says that its tax penalties must be assessed and collected in the same manner as chapter 68 subchapter B penalties. The first sentence of Section 6671(a) definitively establishes that chapter 68 subchapter B tax penalties are to be assessed and collected in the same manner as taxes. Even if the second sentence would have accomplished that same result for chapter 68 subchapter B penalties, the first sentence makes “double sure,” a routine approach to legislative drafting.[20] And that first sentence — combined with the Affordable Care Act’s cross-reference — establishes that the Affordable Care Act’s tax penalties must be assessed and collected in the same manner as taxes and therefore insulated from pre-enforcement suits.
The majority opinion’s reference to the redundancy (or surplusage) principle here is further flawed because that principle carries force only when there are two alternative interpretations, one of which would eliminate the redundancy or surplusage. But under the majority opinion’s own approach, the entire first sentence of Section 6671(a) would be surplusage. Cf. Microsoft Corp. v. i4i Ltd. Partnership, — U.S. —, 131 S.Ct. 2238, 2248, 180 L.Ed.2d 131 (2011) (“Here, no interpretation of § 282 — including the two alternatives advanced by Microsoft — avoids excess language.”). Indeed, the majority opinion’s invocation of the redundancy principle with regard to the second sentence of Section 6671(a) is particularly misplaced given that the entirety of Section 6671(a) — both the "first and second sentences — is already redundant of Section 6665(a). Section 6665(a), after all, separately establishes that all chapter 68 penalties (not just those in chapter 68 subchapter B) are to be assessed, collected, and otherwise treated as taxes.
The truth is that the broad language of the second sentence of Section 6671(a) makes redundancy with the first sentence inevitable here. The lesson from the redundancy in these sections and elsewhere *38 in the Tax Code is not to read provisions out of the statute or contrary to their plain meaning, as the majority opinion would have us do. Rather, we should read the provisions according to their terms, recognizing that Congress often wants to make “double sure” — a technique so common that it has spawned its own Latin canon, ex abundanti cautela. See Fort Stewart Schools v. FLRA, 495 U.S. 641, 646, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990) (“It might reasonably be argued, of course, that these two exceptions are indeed technically unnecessary, and were inserted out of an abundance of caution — a drafting imprecision venerable enough to have left its mark on legal Latin (ex abundanti cautela).”); see also William Shakespeare, Macbeth act 4, scene 1 (“But yet I’ll make assurance double sure”).[21]
In short, the first sentence of Section 6671(a) on its own dictates that chapter 68 subchapter B penalties are to be assessed and collected in the same manner as taxes. Because Affordable Care Act penalties must be assessed and collected in the same manner as chapter 68 subchapter B penalties, the Affordable Care Act’s penalties likewise must be assessed and collected in the same manner as taxes. To be assessed and collected in the same manner as taxes, all of these tax penalties must be insulated from pre-enforcement suits. If we are to give effect to the plain text of the statute, the Anti-Injunction Act must bar pre-enforcement suits challenging the Affordable Care Act’s penalties for failure to have health insurance.[22]
Ill
In the alternative, in analysis somewhat similar to the Fourth Circuit’s, I would conclude that the Anti-Injunction Act applies here because of the definition of the IRS’s assessment authority provided by Section 6201 of the Tax Code. That section defines “assessable penalties” to be “taxes” for purposes of the IRS’s assessment authority. The Affordable Care Act’s penalty is an assessable penalty and is therefore a tax for purposes of the IRS’s assessment authority under Section 6201. The Anti-Injunction Act bars suits to restrain assessment or collection of taxes. It thus bars this suit.[23]
*39 To spell this out, let’s again go to the text. Section 6201 authorizes and requires the IRS[24] to make “assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title.” 26 U.S.C. § 6201(a). Importantly, Section 6201 thus defines taxes for assessment purposes as “including” additional amounts, additions to the tax, and assessable penalties, which are the three kinds of civil penalties imposed by the Tax Code and assessed by the IRS.[25]
Of particular relevance here, Section 6201 defines “taxes” to include “assessable penalties” that are “imposed by this title.” Subchapter B of chapter 68 of the Tax Code is entitled “Assessable Penalties.” The Affordable Care Act requires that the “penalty” for failure to have health insurance be “assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68.” 26 U.S.C. § 5000A(g)(l). Because the Affordable Care Act penalty is a Tax Code “penalty” that is to be “assessed” by the IRS — and, moreover, is to be assessed “in the same manner as” a chapter 68 sub-chapter B “assessable penalty” — it is an “assessable penalty.” Because the Affordable Care Act penalty is an assessable penalty and because Section 6201 classifies assessable penalties as taxes for purposes of the IRS’s assessment power, the Affordable Care Act penalty is a tax for purposes of the IRS’s assessment authority under Section 6201.
The Anti-Injunction Act in turn provides that “no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person.” 26 U.S.C. § 7421(a). Given that Section 6201 defines “assessments of all taxes” to include assessment of the Affordable Care Act penalty at issue here, and given that the Anti-Injunction Act bars suits to restrain the “assessment ... of any tax,” the Anti-Injunction Act bars a suit to restrain the assessment of these Affordable Care Act tax penalties just as it bars a suit to restrain the assessment of taxes. Therefore, plaintiffs’ suit is barred by the Anti-Injunction Act.[26]
*40 How does the majority opinion respond to this? The majority opinion simply asserts that the Affordable Care penalty is not an assessable penalty under Section 6201 and thus is not covered by that section. I find the majority opinion’s reasoning on this point quite unpersuasive.
The majority opinion insists that the only “assessable penalties” in the Tax Code are those listed in chapter 68 sub-chapter B. That is incorrect. Section 6201 — which defines the IRS’s assessment authority — speaks of “assessable penalties” imposed “by this title,” not just of assessable penalties imposed by chapter 68 of the title.[27] Indeed, there are numerous “assessable penalties” in the Tax Code that are outside of chapter 68. For example, chapter 61 contains several assessable penalties, and the IRS itself states that the “assessable penalties” in the Code are not all in chapter 68. See Internal Revenue Manual 20.1.9.1.1 (Apr. 22, 2011) (a number of penalties in Sections 6038-6038C of chapter 61 “are assessable penalties and are not covered by deficiency procedures”); see also 26 U.S.C. §§ 6038(b), 6038A(d), 6038B(c), 6038C(c).
Moreover, if the Affordable Care Act “penalty” is not an “assessable penalty,” what kind of Tax Code civil penalty does the majority opinion think it is? The two other options are an “additional amount” or an “addition to the tax.” After all, additional amounts, additions to the tax, and assessable penalties are the civil penalties imposed by the Tax Code and assessed by the IRS. Numerous provisions of the Code refer to additional amounts, additions to the tax, and assessable penalties as the universe of Tax Code civil penalties that are assessed by the IRS. See, e.g., 26 U.S.C. §§ 860(h), 6155(a), 6201(a), 6202, 6321, 6324A(a), 6601(e)(2), 6602, 7122(b), 7522(a). But all three categories of civil penalties are defined by Section 6201 to be “taxes” for purposes of the IRS’s assessment authority. So even if the Affordable Care Act penalty were an additional amount or an addition to the tax, it would still be a tax under Section 6201 and the Anti-Injunction Act would still apply. The majority opinion’s effort to wriggle out of Section 6201 is futile.
In sum, the Affordable Care Act penalties at issue here are defined to be taxes for purposes of the IRS’s assessment power under Section 6201. That necessarily means that these penalties also are taxes for purposes of the Anti-Injunction Act’s protection against pre-enforcement suits seeking to restrain the IRS’s assessment of “any tax.” For that alternative and independent reason, the Anti-Injunction Act bars the Court from deciding this suit.[28]
*41 IV
Trying a different approach, the majority opinion separately contends that the Anti-Injunction Act does not apply to plaintiffs’ suit even if the Affordable Care Act penalties are taxes for purposes of the Anti-Injunction Act. According to the majority opinion, plaintiffs are challenging only the mandate to purchase health insurance and not the tax penalties imposed for violating the mandate (even though the mandate is enforced solely through these tax penalties). The majority opinion argues that the Anti-Injunction Act does not apply when a plaintiff purports to challenge the regulatory purpose or effect of a tax. That is the same reasoning this Court adopted to get around the Anti-Injunction Act in our 1973 decision in Americans United. The problem for the majority opinion here is that the Supreme Court emphatically rejected this Court’s reasoning in that case, calling it “unpersuasive” and “circular.” Alexander v. “Americans United” Inc., 416 U.S. 752, 760-62, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974), rev’g 477 F.2d 1169 (D.C.Cir.1973); see also Bob Jones Univ. v. Simon, 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974). There is no call for a sequel.
The majority opinion’s effort to characterize plaintiffs’ suit as a challenge to the mandate and not to the tax penalty is wrong on the facts and wrong on the law. It is wrong on the facts because plaintiffs’ complaint repeatedly and unmistakably asks for relief from the Affordable Care Act’s tax penalties.[29] It is wrong on the *42 law because, in any event, the Supreme Court has squarely held that a taxpayer cannot avoid the Anti-Injunction Act by purporting to challenge the regulatory purpose or effect of a tax.
Regulatory taxes regulate behavior by imposing higher taxes on disfavored behavior and lower taxes on favored behavior. See Sonzinsky v. United States, 300 U.S. 506, 513, 57 S.Ct. 554, 81 L.Ed. 772 (1937). In cases involving regulatory taxes, the Supreme Court has flatly rejected evasion of the Anti-Injunction Act through the kind of semantics employed by the majority opinion here. In both Bob Jones and Americans United, the plaintiff nonprofit organizations argued that they were challenging the IRS’s termination of their tax-exempt status for allegedly engaging in disfavored conduct (race discrimination in one case and improper lobbying in the other), not the increased taxes they would have to pay because of the denial of their tax-exempt status. The organization in Americans United even offered to pay its extra taxes regardless of the outcome of the case in order to show that it was not seeking to avoid payment of taxes. See 416 U.S. at 760, 94 S.Ct. 2053. The Supreme Court held that the Anti-Injunction Act still barred the suits, stating that taxpayers cannot end-run the Anti-Injunction Act by claiming that they object to a tax law’s regulatory effect and not the tax itself. The Court further stated that taxpayers cannot evade the Anti-Injunction Act by claiming that the Government’s purpose in imposing the tax was to regulate behavior more than to raise revenue. The key inquiry, according to the Supreme Court, is the suit’s impact on tax collection: whether the taxpayers’ suit, if successful, would reduce the plaintiffs’ taxes — or indeed “anyone’s taxes.” Id. If so, then the Anti-Injunction Act applies. See Bob Jones, 416 U.S. at 738-42, 94 S.Ct. 2038; Americans United, 416 U.S. at 760-62, 94 S.Ct. 2053.
The Supreme Court later summarized that principle this way: “Because the suit would have restrained the collection of income taxes from the taxpayer and its contributors, as well as the collection of federal social security and unemployment taxes from the taxpayer, the Court concluded that the suit was an action to restrain the assessment or collection of any tax within the meaning of the Anti-Injunction Act.” South Carolina v. Regan, 465 U.S. 367, 375, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984) (internal quotation marks omitted).[30]
Bob Jones and Americans United therefore mean the following: If the only sanction attached to a federal law that regulates private behavior is the imposition of a civil tax exaction that falls within the coverage of the Anti-Injunction Act, then the Anti-Injunction Act applies and, absent a recognized exception, precludes a pre-enforcement suit challenging that law. The Anti-Injunction Act cannot be evaded by *43 characterizing the suit as a challenge only to the regulatory aspect of a tax. The Act is more than a pleading hurdle. A regulatory tax, at least so long as it actually would raise some revenue, is a tax within the meaning of the Anti-Injunction Act. See Bob Jones, 416 U.S. at 738-48, 94 S.Ct. 2038.[31]
In attempting to distinguish away Bob Jones and Americans United, the majority opinion says those eases apply only if the regulation and tax are “inextricably linked.” Maj. Op. at 10. But the Supreme Court did not use that phrase in its opinions in Bob Jones and Americans United, and it is unclear what the majority opinion here intends it to mean. What the Supreme Court did say is that a suit challenging a regulatory tax is barred by the Anti-Injunction Act if the suit would restrain the IRS’s assessment or collection of taxes. Plaintiffs’ suit here would do just that; therefore, it is barred.[32]
Moreover, the Supreme Court long ago held that the Anti-Injunction Act applies even to a regulatory tax that effectively prohibits (or mandates) conduct, not just one that disincentivizes (or ineentivizes) conduct. See Bailey v. George, 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816 (1922); Bailey v. Drexel Furniture Co., 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817 (1922). In the twin Bailey cases, the Supreme Court recognized that the Child Labor Tax didn’t just discourage employment of child labor; it in effect prohibited it. The Court nonetheless held that the Anti-Injunction Act barred a pre-enforcement suit challenging the prohibition. That Bailey principle re *44 mains good law, as the Supreme Court explained in Bob Jones: “Moreover, petitioner’s argument fails to give appropriate weight to Bailey v. George, 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816 (1922). In that case, the Court held that the Act blocked a pre-enforcement suit to enjoin collection of the federal Child Labor Tax, although the tax was challenged as a regulatory measure beyond the taxing power of Congress. Significantly, the Court announced Bailey v. George on the same day that it issued Bailey v. Drexel Furniture Co., 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817 (1922), a tax-refund case in which the Court struck down the Child Labor Tax Law as unconstitutional on the grounds that the taxpayer attempted to raise prematurely in Bailey v. George.” 416 U.S. at 740-41, 94 S.Ct. 2038.
So to the extent the majority opinion here tries to argue that there’s an Anti-Injunction Act distinction between (i) a civil tax provision that creates a mandate or prohibition and (ii) a tax provision that creates an incentive or disincentive, that distinction does not work. The relevant Anti-Injunction Act question is whether plaintiffs’ suit, if successful, would reduce their tax liability. Here, plaintiffs’ suit, if successful, vrould reduce (to zero) their tax penalties for failure to maintain health insurance. Under Bob Jones and Americans United, the Anti-Injunction Act therefore applies.[33]
Given the clarity of the relevant Supreme Court precedent, the Government, which otherwise now argues that the Anti-Injunction Act does not bar this suit, still expressly disavows the rationale set forth here by the majority opinion. As the Solicitor General recently told the Supreme Court: “The Anti-Injunction Act, when applicable, bars any suit seeking relief that would necessañly preclude the assessment or collection of taxes under the Internal Revenue Code, regardless of the plaintiffs professed motivation for the suit.” Brief for United States in Opposition at 16, 22 & n. 9, Liberty Univ. v. Geithner, No. 11-438 (U.S. Oct. 18, 2011) (citing Bob Jones, 416 U.S. at 731-32, 94 S.Ct. 2038) (internal quotation marks omitted) (emphasis added).
Finally, as a last try, the majority opinion suggests that these Affordable Care Act tax penalties aren’t designed to raise revenue for the Government and, for that reason, may not qualify as taxes for purposes of the Anti-Injunction Act. But the *45 Court in Bob Jones held that regulatory taxes are covered by the Anti-Injunction Act as long as they raise some revenue. See 416 U.S. at 741 n. 12, 743 n. 17, 94 S.Ct. 2038; cf. Sonzinsky, 300 U.S. at 514, 57 S.Ct. 554. Here, the Congressional Budget Office has estimated the Government will collect about $4 billion a year in revenue from the Affordable Care Act’s tax penalties on those without health insurance. See Letter from Douglas W. Elmendorf, Director, Cong. Budget Office, to Sen. Harry Reid tbl.3 (Mar. 11, 2010). To put it in concrete terms, that would pay the annual salaries of about 100,000 members of the U.S. Military. That’s real revenue.
In short, we cannot avoid the Anti-Injunction Act either by characterizing plaintiffs’ complaint as a challenge to the mandate and not to the tax penalty, or by characterizing the Government’s goal as regulating the decision to buy health insurance rather than as raising revenue.
V
Plaintiffs and the Government have suggested, as have a host of outside commentators, that the courts should decide the constitutionality of the individual mandate provision now because the country has a pressing need for an immediate judicial resolution. I respect that argument. But prudential considerations of that sort cannot override the text of a statute that limits our jurisdiction. There is no “compelling prudential considerations” exception to the Anti-Injunction Act. In any event, the relevant prudential considerations on balance support our waiting to decide this case until 2015, in tax refund or enforcement suits that are brought after the mandate has taken effect.
A
Contrary to the suggestions of some, we cannot simply disregard the Anti-Injunction Act. The Supreme Court has emphasized that the desire for. a final judicial decision on the constitutionality of a law cannot trump constitutional or statutory limits on the judicial power.
In Raines v. Byrd, for example, the Supreme Court considered the constitutionality of the Line Item Veto Act, an issue even more fundamental to government operations and budgetary issues than the current litigation over the individual mandate. But the Court explained that the preference for a prompt judicial resolution of the legislation’s constitutionality could not overcome constraints on the Court’s jurisdiction — in that case, the Constitution’s standing requirement: “In the light of this overriding and time-honored concern about keeping the Judiciary’s power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of this important dispute and to ‘settle’ it for the sake of convenience and efficiency.” 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (footnote omitted).
Some have contended, however, that Congress would have wanted the courts to decide this case now, notwithstanding the Anti-Injunction Act. But Congress did not express any such alleged intent in the text of the Affordable Care Act. The parties cite no committee report or even an individual statement by a Member of Congress expressing the view that courts should decide challenges to the individual mandate immediately, despite the Anti-Injunction Act. So even if we employ the most generous approach to legislative history, we find no support for this argument. Cf. Puerto Rico Dep’t of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 501, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988) (“unenacted approvals, beliefs, and desires are not laws”).
*46 The invocation of presumed congressional intent is particularly inappropriate here because Congress clearly devoted careful attention to the tax enforcement details of the individual mandate provision. Congress specifically barred the IRS from using some of its traditional tools to enforce the mandate. But Congress did not create an exception to the Anti-Injunction Act to allow pre-enforcement suits challenging the constitutionality of the mandate. Here as elsewhere, courts should not upend the balance Congress struck in the statutory text.
Some have said that the health insurance industry prefers a decision now and that Congress would have wanted courts to accommodate that concern. That is certainly a reason Congress could have decided- — and still could decide — to exempt this statute from the Anti-Injunction Act.[34] After all, the voice of the health insurance industry was heard when this legislation was crafted. But Congress did not exempt the individual mandate provision from the Anti-Injunction Act. We cannot rewrite the Affordable Care Act to accommodate an alleged congressional intent to follow the apparent wishes of the health insurance industry.
Some have suggested that the Anti-Injunction Act does not apply because these suits have been brought so far in advance of the mandate’s 2014 effective date. But there is no “early-bird special” exception to the Anti-Injunction Act. And creating such an exception would pose a host of arbitrary line-drawing problems. The proper audience for such an argument is Congress, which can always carve out an exemption to the Anti-Injunction Act or set up a special judicial review proceeding of the kind employed for the Line Item Veto Act or the Bipartisan Campaign Reform Act. But Congress has not done so, and we must adhere to the congressional choice reflected in the statutory text. See Bob Jones Univ. v. Simon, 416 U.S. 725, 750, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974) (“But this matter is for Congress, which is the appropriate body to weigh the relevant, policy-laden considerations, such as the harshness of the present law....”).
If Congress wants the courts to decide the individual mandate suits now, Congress can always remove the jurisdictional limit; the Anti-Injunction Act’s jurisdictional bar is statutory, not constitutional. Absent such congressional action, however, we must adhere to the statutory constraints on our jurisdiction no matter how much the parties might want us to jump the jurisdictional rails and decide this case now.
B
Even if we could alter our interpretation of the Anti-Injunction Act based on prudential considerations, those considerations on balance support our waiting to decide this case until 2015 (in tax refund or enforcement suits brought after the mandate has taken effect). By waiting, we would respect the bedrock principle of judicial restraint that courts avoid prematurely or unnecessarily deciding constitutional questions.
The Supreme Court recently summarized those essential tenets while declining to reach a vital question about the constitutionality of Section 5 of the Voting Rights Act:
*47 That constitutional question has attracted ardent briefs from dozens of interested parties, but the importance of the question does not justify our rushing to decide it. Quite the contrary: Our usual practice is to avoid the unnecessary resolution of constitutional questions. We agree that the district is eligible under the Act to seek bailout. We therefore reverse, and do not reach the constitutionality of § 5....
In assessing those questions, we are keenly mindful of our institutional role. We fully appreciate that judging the constitutionality of an Act of Congress is the gravest and most delicate duty that this Court is called on to perform. The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States....
We will not shrink from our duty “as the bulwark of a limited constitution against legislative encroachments,” The Federalist No. 78, p. 526 (J. Cooke ed. 1961) (A. Hamilton), but it is a well-established principle governing the prudent exercise of this Court’s jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.
Northwest Austin Municipal Utility District Number One v. Holder, 557 U.S. 193, 129 S.Ct. 2504, 2508, 2513, 174 L.Ed.2d 140 (2009) (some citations, internal quotation marks, and brackets omitted).
Although the Northwest Austin Court was addressing the constitutional avoidance canon, the general principles it articulated about avoiding premature or unnecessary constitutional decisions apply to this case as well.[35]
C
The principle that we avoid premature or unnecessary constitutional decisions applies with special force here. That’s because if we do not decide the constitutional issue now, we may never have to decide it.
First, this case could disappear by 2015 because, by then, Congress may fix the alleged constitutional shortcoming and ensure that the Affordable Care Act’s individual mandate provision fits comfortably within Congress’s Taxing Clause power. To be clear, I do not take a position here on whether the statute as currently written is justifiable under the Taxing Clause *48 or the Commerce Clause. What I am saying is that the only potential Taxing Clause shortcoming in the current individual mandate provision appears to be relatively slight. And just a minor tweak to the current statutory language would definitively establish the law’s constitutionality under the Taxing Clause (and thereby moot any need to consider the Commerce Clause).[36]
The only reason[37] the current statute may not suffice under the Taxing Clause is that Section 5000A arguably does not just incentivize certain kinds of lawful behavior but also mandates such behavior. Section 5000A provides: “An applicable individual shall for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential co'verage for such month.” 26 U.S.C. § 5000A(a) (emphasis added).
Therefore, beginning in 2014, a citizen who does not maintain health insurance might be acting illegally.[38] The Taxing Clause has not traditionally authorized a *49 legal prohibition or mandate, as opposed to just a financial disincentive or incentive.[39] Another source of constitutional authority — for example, the Commerce Clause— has customarily been thought necessary to justify such prohibitions or mandates.[40]
Many have contended, however, that a legal mandate with a civil tax penalty for non-compliance is economically indistinguishable from a traditional regulatory tax if the amounts of the exactions are the same. Such an argument assumes that citizens care only about economic incentives and not also about complying -with The Law. Plaintiffs vigorously contest that assertion. According to plaintiffs, the United States does not necessarily consist of 310 million people who have over-absorbed their Posner and equate (i) a traditional regulatory tax that incentivizes or disincentivizes certain behavior and (ii) a legal mandate or prohibition accompanied by a tax penalty of the same amount. After all, plaintiffs say, common sense tells us that many citizens want to be law-abiding (and known as law-abiding), and that their desire to be law-abiding affects their behavior.[41] For purposes of the Taxing Clause, mandates and prohibitions might be one step beyond the traditional kinds of regulatory taxes that the Taxing Clause has authorized.
But this discussion about the potential problem with the Government’s Taxing Clause argument also shows how easily Congress could eliminate any such potential problem. For example, Congress might keep the current statutory language and payment amounts and simply add a provision as basic as: “The taxpayer has a lawful choice either to maintain health insurance or make the payment to the IRS required by Section 5000A(a)-(c).” Or Congress might retain the exactions and payment amounts as they are but eliminate the legal mandate language in Section 5000A, instead providing something to the effect of: “An applicable individual without minimum essential coverage must make a payment to the IRS on his or her tax return in the amounts listed in Section 5000A(c).” Or Congress could adopt the approach from the House-passed bill, which expressly created a tax incentive and plainly satisfied the Taxing Clause.
Any of those options — and others as well — would ensure that this provision operates as a traditional regulatory tax and readily satisfies the Taxing Clause. See *50 United States v. Sanchez, 340 U.S. 42, 44, 71 S.Ct. 108, 95 L.Ed. 47 (1950) (even a tax with “regulatory character and prohibitive burden” “does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed”); Sonzinsky v. United States, 300 U.S. 506, 513, 57 S.Ct. 554, 81 L.Ed. 772 (1937) (“[A]n Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed.”); cf., e.g., Affordable Health Care for America Act, H.R. 3962, 111th Cong. § 501 (2009) (House-passed bill on health care reform imposing a “[t]ax on individuals without acceptable health care coverage”); Patients’ Choice Act, H.R. 2520, 111th Cong. §§ 301-303 (2009) (proposing to amend the Tax Code to create a refundable tax credit for the purchase of qualifying health insurance plans).[42]
Second, but far more broadly, by 2015 Congress might choose to eliminate Section 5000A altogether — that is, eliminate this financial disincentive for failing to have health insurance. Or the President might not enforce the individual mandate provision if the President concludes that enforcing it would be unconstitutional.[43] In one of those events, the courts would likewise never have to opine on the constitutional issues presented in this case.
We all recognize the legislative realities that make any change unlikely, whether just to “fix” any potential constitutional problem or to take more significant action with respect to Section 5000A. After all, our constitutional system requires action by three entities before any legislative change may be approved — House, Senate, and • Executive. Therefore, it is much harder to pass legislation — even technical fixes — than to block legislation. That said, there is the possibility of such legislative action that could obviate the need for the Judiciary to decide this immensely consequential constitutional issue.
To be clear, federal courts do not wait to decide constitutional cases simply because of the possibility of congressional change to the legislation or presidential nonenforcement of what the President concludes is an unconstitutional law. Delay on that basis would constitute judicial abdication, not judicial restraint. But the discussion here has been addressing the question *51 whether there are compelling prudential considerations that would justify overriding the limits of the Anti-Injunction Act and deciding this case now. In considering that specific question, it is relevant to note that waiting to decide might mean never having to decide, a prospect that supports adherence to the Anti-Injunction Act.
D
There is an additional compelling reason to be wary of an unnecessary or premature constitutional ruling in this case. As I have said, the Government’s Taxing Clause argument may have a potential problem because of the statute’s legal mandate (although that potential problem is relatively minor and could be easily fixed by Congress, as described above). Indeed, no court to reach the merits has accepted the Government’s Taxing Clause argument. As a result, those courts have had to tackle the Government’s Commerce Clause submission.
But the Commerce Clause issue is extremely difficult and rife with significant and potentially unforeseen implications for the Nation and the Judiciary. Cf. Northwest Austin Municipal Utility District Number One, 129 S.Ct. at 2513.[44]
To uphold the Affordable Care Act’s mandatory-purchase requirement under the Commerce Clause, we would have to uphold a law that is unprecedented on the federal level in American history. That fact alone counsels the Judiciary to exercise great caution. See United States v. Lopez, 514 U.S. 549, 580, 583, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Kennedy, J., concurring) (“The statute before us upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, and our intervention is required.... If Congress attempts that extension, then at the least we must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern.... The statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and it does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term.”); see also Printz v. United States, 521 U.S. 898, 905, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (“[I]f, as petitioners contend, earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist.”).
In addition, the Government’s position on the Commerce Clause carries broad implications — far broader than its position on the Taxing Clause. Under the Government’s Commerce Clause theory, as it freely acknowledged at oral argument, the Government could impose imprisonment or other criminal punishment on citizens who do not have health insurance. That is a rather jarring prospect. The Affordable Care Act does not impose such criminal penalties. But if we approve the Affordable Care Act’s mandate under the Commerce Clause, we would necessarily be approving criminal punishment — including imprisonment — for failure to comply not only with this Act but also with future mandatory-purchase requirements.
Moreover, despite the Government’s effort to cabin its Commerce Clause argument to mandatory purchases of health insurance, there seems no good reason its theory would not ultimately extend as well *52 to mandatory purchases of retirement accounts, housing accounts, college savings accounts, disaster insurance, disability insurance, and life insurance, for example. We should hesitate to unnecessarily decide a case that could usher in a significant expansion of congressional authority with no obvious principled limit. That is particularly so given that the government traditionally has achieved its objectives in these areas through Taxing Clause legislation that employs customary and permissible tax incentives and disincentives on certain behavior. Cf. Lopez, 514 U.S. at 580-83, 115 S.Ct. 1624 (Kennedy, J., concurring).
Unlike some other courts that have upheld the mandate on Commerce Clause grounds and disclaimed the implications, the majority opinion here is quite candid— and accurate — in admitting that there is no real limiting principle to its Commerce Clause holding. The majority opinion’s holding means, for example, that a law replacing Social Security with a system of mandatory private retirement accounts would be constitutional. So would a law mandating that parents purchase private college savings accounts. I credit the majority opinion for its refreshing candor. But its acknowledgement of the extraordinary ramifications of its decision expanding Congress’s authority to impose mandatory-purchase requirements underscores why I think we should be cautious about barreling through jurisdictional limits to reach the merits, as the majority opinion does here.
To try to mitigate the dramatic implications of its no-limiting-principle holding, the majority opinion notes that Congress is subject to a political check. That’s true, but as the Supreme Court has told us time' and again, the structural principles of the Constitution are more than parchment barriers; they protect individual liberty. And the courts historically have played an important role in enforcing those structural principles and thereby safeguarding individual liberty. That Congress is subject to a political check does not absolve the Judiciary of its duty to safeguard the constitutional structure and individual liberty. See Bond v. United States, — U.S. —, 131 S.Ct. 2355, 2364-65, 180 L.Ed.2d 269 (2011); Free Enterprise Fund v. Public Co. Accounting Oversight Bd., — U.S. —, 130 S.Ct. 3138, 3157, 177 L.Ed.2d 706 (2010); Clinton v. City of New York, 524 U.S. 417, 449-53, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Kennedy, J., concurring); Lopez, 514 U.S. at 575-80, 115 S.Ct. 1624 (Kennedy, J., concurring); INS v. Chadha, 462 U.S. 919, 940-42, 944-59, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); see also Morrison v. Olson, 487 U.S. 654, 697-734, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). Here, Congress’s being subject to a political check thus does not do much to mitigate the fact that the majority opinion has green-lighted a significant expansion of congressional authority — and thus also a potentially significant infringement of individual liberty.
Having said all of that, we should be just as cautious about prematurely or unnecessarily rejecting the Government’s Commerce Clause argument. The reason is plain and needs little elaboration: Striking down a federal law as beyond Congress’s Commerce Clause authority is a rare, extraordinary, and momentous act for a federal court. See Lopez, 514 U.S. at 568, 568-75, 115 S.Ct. 1624 (Kennedy, J., concurring) (exploring Commerce Clause history, which “counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power”).
The elected Branches designed this law to help provide all Americans with access to affordable health insurance and quality health care, vital policy objectives. This *53 legislation was enacted, moreover, after a high-profile and vigorous national debate. Courts must afford great respect to that legislative effort and should be wary of upending it.
This case also counsels restraint because we may be on the leading edge of a shift in how the Federal Government goes about furnishing a social safety net for those who are old, poor, sick, or disabled and need help. The theory of the individual mandate in this law is that private entities will do better than government in providing certain social insurance and that mandates will work better than traditional regulatory taxes in prompting people to set aside money now to help pay for the assistance they might need later. Privatized social services combined with mandatory-purchase requirements of the kind employed in the individual mandate provision of the Affordable Care Act might become a blueprint used by the Federal Government over the next generation to partially privatize the social safety net and government assistance programs and move, at least to some degree, away from the tax-and-government-benefit model that is common now. Courts naturally should be very careful before interfering with the elected Branches’ determination to update how the National Government provides such assistance. Cf. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937).
The significant implications of a Commerce Clause decision in this case — in either side’s favor — lead to this point: If we need not decide the Commerce Clause issue now, we should not decide the Commerce Clause issue now. I therefore would not strain to sidestep the Anti-Injunction Act.
E
To be sure, courts may not shirk their duty to “say what the law is” in cases that are properly before them. See Marburg v. Madison, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). As the Supreme Court has famously stated: “With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.” Cohens v. Virginia, 19 U.S. 264, 404, 6 Wheat. 264, 5 L.Ed. 257 (1821).
And in fulfilling their duties, courts sometimes must decide difficult and far-reaching constitutional cases sooner rather than later. See, e.g., Dames & Moore v. Regan, 453 U.S. 654, 660, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); United States v. Nixon, 418 U.S. 683, 686-87, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Cooper v. Aaron, 358 U.S. 1, 4-5, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 584, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).
But history and precedent counsel caution before reaching out to decide difficult constitutional questions too quickly, especially when the underlying issues are of lasting significance. After all, what appears to be obviously correct now can look quite different just a few years down the road. See W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), overruling Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (Hughes, C.J.), backing away from A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (Hughes, C.J.).
*54 Between now and 2015, Congress might keep the mandate as is and the President may enforce it as is. If that happens, the federal courts would resolve the resulting constitutional case by our best lights and would not shy away from a necessary constitutional decision. But history tells us to cross that bridge only if and when we need to. Unlike the majority opinion, I would adhere to the text of the Anti-Injunction Act and leave these momentous constitutional issues for another day — a day that may never come.
I have the greatest respect for my two colleagues on this panel. But my analysis leads me decisively to the conclusion that we lack jurisdiction because of the Anti-Injunction Act. I therefore would vacate the judgment of the District Court and remand with directions that the suit be dismissed for lack of jurisdiction. I respectfully dissent.

. In this court, no States are plaintiffs. We therefore need not consider whether the Anti-Injunction Act would apply differently to a State’s challenges to the individual mandate. Regardless, States may not have standing to challenge the individual mandate, for reasons the Fourth Circuit explained. See Virginia v. Sebelius, 656 F.3d 253 (4th Cir.2011).

. Section 5000A(g)(l) refers to "paragraph (2)” of Section 5000A(g). Paragraph (2) precludes the IRS from using some of its more aggressive enforcement tools, such as levies, notices of liens, or criminal prosecution, when a citizen fails to have health insurance and fails to pay the required tax penalty. The IRS's primary enforcement tool under this statute for those who do not have health insurance and fail to pay the required penalty consists of offsets to tax refunds.

. When I refer in this opinion to the Affordable Care Act penalties, I am referring only to the penalty in Section 5000A for failure to maintain health insurance. This case does not call upon us to examine the various other taxes and penalties imposed by the wide-ranging Affordable Care Act.

. Both sides before us want this case decided now and contend that the Anti-Injunction Act does not bar this suit. The amicus brief of former IRS Commissioners Mortimer Caplin and Sheldon Cohen, submitted by able counsel Alan Morrison, cogently argued the opposite position. The Court is grateful to amici and counsel for their assistance.

. In recent years, the Court has carefully analyzed whether certain provisions governing a lawsuit’s timing relate to claims processing rather than jurisdiction. See, e.g., Bowles v. Russell, 551 U.S. 205, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007); Eberhart v. United States, 546 U.S. 12, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005); Kontrick v. Ryan, 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004). In so doing, the Court has reiterated that statutes like the Anti-Injunction Act that speak to the power of the court remain jurisdictional.

. This Court has also recognized the jurisdictional status of the Act. See, e.g., Gardner v. United States, 211 F.3d 1305, 1311 (D.C.Cir.2000) ("The District Court must dismiss for lack of subject matter jurisdiction any suit that does not fall within one of the exceptions to the Anti-Injunction Act.”); Nat’l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1435 (D.C.Cir.1995) (same). Indeed, every court of appeals has found the Act jurisdictional.
The Supreme Court has consistently held that the related State Tax Injunction Act, 28 U.S.C. § 1341, is likewise jurisdictional. See Levin v. Commerce Energy, Inc.,- U.S. -, 130 S.Ct. 2323, 2335 n. 10, 176 L.Ed.2d 1131 (2010) ("This Court and others have continued to regard the Act as jurisdictional.”); Hibbs v. Winn, 542 U.S. 88, 107, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (TIA is a "jurisdictional bar”); Arkansas v. Farm Credit Services of Central Arkansas, 520 U.S. 821, 823, 117 S.Ct. 1776, 138 L.Ed.2d 34 (1997) (same); California v. Grace Brethren Church, 457 U.S. 393, 396, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982) (TIA "deprived the District Court of jurisdiction to hear these challenges”).

. On other occasions prior to Helvering v. Davis, the Court likewise held that the Anti-Injunction Act did not pose a jurisdictional bar to private litigation between a shareholder and a corporation. See Brushaber, 240 U.S. at 10, 36 S.Ct. 236; Pollock v. Fanners’ Loan & Trust Co., 157 U.S. 429, 554, 15 S.Ct. 673, 39 L.Ed. 759 (1895).

. The Supreme Court has held that the Anti-Injunction Act does not apply in cases where the Government’s argument in support of the tax is frivolous. See Enochs v. Williams Packing, 370 U.S. at 7, 82 S.Ct. 1125; Bob Jones, 416 U.S. at 745, 94 S.Ct. 2038. The Supreme Court has also made clear that the Anti-Injunction Act applies to pre-enforcement suits only where there is an adequate alternative remedy, such as a refund suit. See South Carolina v. Regan, 465 U.S. 367, 381, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984). Here, the Government’s position on the constitutional issue is obviously not frivolous, and a tax refund or enforcement suit is available to litigate the constitutional claims. Plaintiffs *29 do not mount any meaningful contention otherwise.
I bring that point up now because some have suggested that the existence of those “exceptions” to the Anti-Injunction Act undermines the conclusion that it is jurisdictional. That suggestion reflects a misunderstanding of the concept of jurisdiction. Courts must consider a jurisdictional statute even when not raised. But the status of a statute as jurisdictional does not disable the courts from interpreting the statute and Congress’s intent by means of the usual tools of statutory construction. See, e.g., id. ("the Act was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf”).

. As an alternative to the refund suit, a resistant taxpayer who does not pay a required tax or penalty may face an IRS enforcement action seeking to collect the unpaid taxes or penalties. In those proceedings, the taxpayer generally may raise constitutional or statutory arguments as defenses to the underlying payment obligation.

. Federal law not only bars pre-enforcement suits to enjoin the assessment or collection of taxes, but also bars pre-enforcement suits seeking declaratory judgments "with respect to Federal taxes.” 28 U.S.C. § 2201(a). In Bob Jones, the Supreme Court held that “the federal tax exception to the Declaratory Judgment Act is at least as broad as the Anti-Injunction Act.” 416 U.S. at 733 n. 7, 94 S.Ct. 2038.

. See, e.g., Office of Tax Policy, Dep't of the Treasury, Report to the Congress on Penalty and Interest Provisions of the Internal Revenue Code 36 (1999) ("[PJenalties clearly signal that noncompliance is not acceptable behavior. ... In establishing social norms and expectations, subjecting the noncompliant behavior to any penalty may be as important as the exact level of the penalty....”); Exec. Task Force for the Commissioner's Penalty Study, Report on Civil Tax Penalties at II — 4 (1989) (penalty is adverse consequence for failure to comply with a rule); id. at III — 1 ("Penalties as a consequence of violating a standard of behavior remind taxpayers of their duty.”); id. at X-l ("Penalties are a tool for change.”).

. Professor Bittker stated: "Virtually all civil penalties are assessed, collected, and subject to statutes of limitations in the same manner as taxes.” Boris I. Bittker et al. Federal Income Taxation of Individuals V 50.03 (3d ed.2002). Assessment is the actual recording of the tax by the IRS. See 26 U.S.C. § 6203.

. It appears that Congress was of two minds about whether this exaction should be called an "excise tax” and placed in chapter 48 of Subtitle D, which is entitled "Miscellaneous Excise Taxes,” or called a penalty and placed in chapter 68 subchapter B, which is entitled "Assessable Penalties.” See Staff of Joint Committee on Taxation, JCX-27-10, Errata For JCX-18-10, at 2 (2010) (the Section 5000A "penalty is an excise tax”). Congress ended up placing it in chapter 48 of Subtitle D but calling it a‘penalty, cross-referencing chapter 68 subchapter B, and providing that the penalty must be assessed and collected by the IRS in the same manner as taxes. That untidiness might have been cleaned up had there been a House-Senate conference on this legislation. Some extraordinary electoral circumstances short-circuited that process. But it is telling, in any event, that both (i) excise taxes in chapter 48 of Subtitle D and (ii) assessable penalties in chapter 68 subchapter B are conceded by all parties to be subject to the Anti-Injunction Act. It would be quite odd — structurally speaking — to conclude that because the individual mandate provision is a mix of *31 both, suddenly the Anti-Injunction Act does not apply.

. The Supreme Court has recognized that point many times. See Hibbs v. Winn, 542 U.S. 88, 101 n. 3, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) ("Income taxes, by contrast, are lypically self-assessed in the United States. As anyone who has filed a tax return is unlikely to forget, the taxpayer, not the taxing authority, is the first party to make the relevant *33 calculation of income taxes owed.”); United States v. Galletti, 541 U.S. 114, 122, 124 S.Ct. 1548, 158 L.Ed.2d 279 (2004) (“The Federal tax system is basically one of self-assessment, whereby each taxpayer computes the tax due and then files the appropriate form of return along with the requisite payment. In most cases, the Secretary accepts the self-assessment and simply records the liability of the taxpayer.”) (internal quotation marks and citation omitted); Commissioner v. Lane-Wells Co., 321 U.S. 219, 223, 64 S.Ct. 511, 88 L.Ed. 684 (1944) ("The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished.”); see also Bittker et al„ Federal Income Taxation of Individuals V 44.01 (“The importance of the tax return as the basic document on which the self-assessment system rests is attested by the number of statutory provisions requiring returns to be filed; specifying their filing dates; attaching legal consequences to the fact of filing, the date of filing, and the information included; and imposing penalties for filing negligent or fraudulent returns and for failing to file.”).

. The Affordable Care Act prohibits the IRS from using some of its traditional enforcement tools to enforce payment of the tax penalties. The majority opinion suggests that the IRS’s ability to use only a subset of its traditional tax enforcement tools casts doubt on the conclusion that the Anti-Injunction Act applies. I respectfully have difficulty with that reasoning. The key point, as I see it, is that the penalty may be enforced only by the IRS, not by the U.S. Attorney or by other federal agencies. The fact that the IRS cannot use all of its traditional enforcement tools does not make it any less an IRS-enforced provision.
Perhaps the most important takeaway from the fact that Congress prevented the IRS from employing everything in its toolbox when enforcing the Affordable Care Act penalty provision is the following: Congress focused specifically on how this tax penalty would be collected and enforced. And Congress determined that some of the usual IRS enforcement tools were out of bounds. But Congress nonetheless did not allow taxpayers to bring pre-enforcement suits challenging the law and seeking to restrain assessment and collection of the tax penalty. Congress did not exempt the individual mandate provision from the Anti-Injunction Act. Congress's careful delineation of proper and improper enforcement tools suggests that Congress acted knowingly in not creating an exception to the Anti-Injunction Act for pre-enforcement constitutional challenges to the individual mandate provision.

. One other aspect of Section 5000A buttresses the conclusion that a taxpayer cannot bring a pre-enforcement suit challenging the individual mandate. Section 5000A(g)(l) provides that the tax penalties for failing to have health insurance "shall be paid upon notice and demand by the Secretary.” That same language — “shall be paid upon notice and demand by the Secretary” — is found in the general penalty provision in chapter 68 subchapter B. See 26 U.S.C. § 6671(a). The requirement that penalties "shall be paid upon notice and demand by the Secretary” generally indicates that the Secretary may assess and demand payment of the tax penalties without pre-enforcement judicial interference, whether by a pre-enforcement suit or a deficiency proceeding in Tax Court. Cf. 26 U.S.C. § 6213. (If the taxpayer still refuses to pay after notice and demand, then the IRS and the taxpayer will have to resolve the dispute in enforcement proceedings.) After all, if a pre-enforcement suit could be filed to block payment of the penalties, then the tax penalties would not be paid "upon notice and demand by the Secretary,” as the statute requires. Absent any textual indication to (he contrary, this language further suggests that a taxpayer may not bring a pre-enforcement suit challenging the individual mandate.

. That conclusion finds further support when we examine how the Anti-Injunction Act applies to other Tax Code penalties that, like the Affordable Care Act penalty, are codified outside of chapter 68 but cross-reference chapter 68. For example, Sections 5114, 5684, and 5761 of the Tax Code impose tax penalties for violation of certain laws related to liquor and tobacco; all provide that the penalties "shall be assessed, collected, and paid in the same manner as taxes, as provided in section 6665(a).”
Section 6665(a), which is in chapter 68, in turn states that "penalties provided by this chapter shall be paid upon notice and demand and shall be assessed, collected, and paid in the same manner as taxes.” (Section 6665(a) thus echoes Section 6671(a), the similarly worded section in chapter 68 cross-referenced by (he Affordable Care Act.) The Government agrees that the tax penalties imposed under Sections 5114, 5684, and 5761 are subject to the Anti-Injunction Act and thus insulated from pre-enforcement suits. See Sup *35 plemental Brief for United States at 4, Liberty Univ. v. Geithner, - F.3d - (4th Cir.2011). But those provisions and their cross-references to chapter 68 cannot logically be distinguished from the Affordable Care Act and its cross-reference to chapter 68. In all of the statutes, after all, a tax "penalty” is imposed by a Tax Code provision outside chapter 68. All of those provisions require that the tax penalty be assessed and collected in the same manner as taxes. Therefore, all of those provisions — including the tax penalty in the Affordable Care Act — are subject to the Anti-Injunction Act and insulated from preenforcement suits. The Government counters that Sections 5114(c)(3), 5684(b), and 5761(e) all expressly refer to "taxes” in cross-referencing Section 6665(a) and thus are distinguishable from Section 5000A. But that is not a relevant distinction. As we have seen, Section 5000A(g)(l) accomplishes that same result by referring to Section 6671(a), which in turn refers to “taxes.” Therefore, Section 5114, 5684, 5761, and 5000A penalties are all subject to the Anti-Injunction Act and insulated from pre-enforcement suits.

. The majority opinion suggests that I am breaking new ground in interpreting the first sentence of Section 6671(a) in this way. The majority opinion is incorrect. Many cases analyzing other Tax Code penalties encompassed by Section 6671(a) have concluded that the Anti-Injunction Act applies to those penalties because of the requirement in the first sentence of Section 6671(a) that the penalties be assessed and collected in the same manner as taxes. See, e.g., Kelly v. Lethert, 362 F.2d 629, 633 (8th Cir.1966); Nat'l Commodity & Barter Ass’n v. United States, 625 F.Supp. 920, 921 (D.Colo.1986); Griffith v. Commissioner, 598 F.Supp. 405, 406 (N.D.Ohio 1983); Crouch v. Commissioner, 447 F.Supp. 385, 386 (N.D.Cal.1978); McAllister v. Dudley, 148 F.Supp. 548, 550-51 (W.D.Pa.1956).
A leading treatise similarly states: “[B]e-cause § 6671(a) provides that penalties shall be assessed and collected as taxes, the Anti-Injunction Act bars taxpayers from seeking to enjoin the assessment of penalties.” Bittker et al., Federal Income Taxation of Individuals ¶ 51.10. It appears, moreover, that no case decided before the current litigation has ever said that the first sentence of Section 6671(a) on its own is insufficient to make the Anti-Injunction Act applicable to a Tax Code penalty.

. See, e.g., Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 226-27, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008) ("Congress may have simply intended to remove any doubt that officers of customs or excise were included in 'law enforcement officers.' ... In any event, we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase.”) (brackets omitted); Norfolk & Western Railway Co. v. American Train Dispatchers Ass’n, 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991); Harrison v. PPG Industries, Inc., 446 U.S. 578, 580 n. 1, 589, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980); see also Springer v. Philippine Islands, 277 U.S. 189, 206, 48 S.Ct. 480, 72 L.Ed. 845 (1928) ("Where a statute contains a grant of power enumerating certain things which may be done and also a general grant of power which standing alone would include these things and more, the general grant may be given full effect if the context shows that the enumeration was not intended to be exclusive.”).

. See Microsoft Corp. v. i4i Ltd. Partnership, - U.S. -, 131 S.Ct. 2238, 2249, 180 L.Ed.2d 131 (2011) ("There are times when Congress enacts provisions that are superfluous----”) (quoting Corley v. United States, 556 U.S. 303, 129 S.Ct. 1558, 1572-73, 173 L.Ed.2d 443 (2009) (Alito, J., dissenting)); DePierre v. United States, - U.S. -, 131 S.Ct. 2225, 2232, 180 L.Ed.2d 114 (2011) ("Accordingly, Congress’ choice to use the admittedly redundant term 'cocaine base' to refer to chemically basic cocaine is best understood as an effort to make clear that clause (iii) does not apply to offenses involving powder cocaine or other nonbasic cocaine-related substances.”); Abbott v. United States, — U.S. -, 131 S.Ct. 18, 29, 178 L.Ed.2d 348 (2010) ("This reading gives effect to the statutory language commanding that all § 924(c) offenders shall receive additional punishment for their violation of that provision, a command reiterated three times.") (emphasis added); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy’ between two laws, a court must give effect to both.... We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.”) (citation omitted); Crandon v. United States, 494 U.S. 152, 174, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (Scalia, J„ concurring in judgment) ("superfluous exceptions (to 'make assurance doubly sure’) are a more common phenomenon than the insertion of utterly pointless language”); Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth., 132 F.3d 775, 782 (D.C.Cir.1998) ("Sometimes Congress drafts statutory provisions that appear preclusive of other unmentioned possibilities — just as it sometimes drafts provisions that appear duplicative of others— simply, in Macbeth’s words, 'to make assurance double sure.’ That is, Congress means to clarify what might be doubtful — that the mentioned item is covered — without meaning to exclude the unmentioned ones.”).

.Indeed, the Constitution employs this approach. See United States v. Wiltberger, 18 U.S. 76, 115 n. a, 5 Wheat. 76, 5 L.Ed. 37 (1820) (Marshall, C.J.) ("It seems highly probable that the expression ‘maritime jurisdiction,’ in the constitution, was borrowed from the language of those commissions, and was introduced ex abundanti cautela, and superadded to the term 'admiralty,' in order to obviate any doubt as to the full extent of the authority meant to be conferred.”); Brown v. United States, 12 U.S. 110, 150-51, 8 Cranch 110, 3 L.Ed. 504 (1814) (Story, L, dissenting) ("If the constitution had been silent as to letters of marque and captures, it would not have narrowed the authority of congress. The authority to grant letters of marque and reprisal, and to regulate captures, are ordinary and necessary incidents to the power of declaring war. It would be utterly ineffectual without them. The expression, therefore, of that which is implied in the very nature of the grant, cannot weaken the force of the grant itself. The words are merely explanatory, and introduced ex abundanti cautela.").

. The majority opinion reasons that Congress could easily have said in Section 5000A: "The Anti-Injunction Act applies to these tax penalties.” True, but Congress could just as easily have said: "The Anti-Injunction Act does not apply to these tax penalties.” Congress did neither. We must analyze the statutory terms that Congress employed, not those that we wish Congress had employed.

. The Fourth Circuit relied on Section 6201 to conclude that the Anti-Injunction Act barred a pre-enforcement suit challenging the Affordable Care Act’s individual mandate. See Liberty Univ. v. Geithner, - F.3d - (4th Cir.2011). Although I do not agree with every detail of the Fourth Circuit's reasoning, I do agree with its bottom-line conclusion that *39 Section 6201 defines the Affordable Care Act penalty to be a tax for purposes of the IRS's assessment authority, which in turn means that the Affordable Care Act penalty is insulated from pre-enforcement suits by the Anti-Injunction Act.

. The statute refers to the Secretary of the Treasury, who in turn has delegated assessment and collection responsibility to the IRS, specifically to the Commissioner of Internal Revenue. See 26 U.S.C. § 7701(a)(ll)(B); see also, e.g., 26 C.F.R. §§ 301.6201-1, 301.7701-9 (2011). For convenience, I will refer here to the IRS.

. The Anti-Injunction Act generally does not apply to penalties that are imposed outside of the Tax Code and enforced by federal government officials or agencies other than the IRS. See FEA v. Algonquin SNG, Inc., 426 U.S. 548, 558 n. 9, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976) (Act does not apply in case involving penalties imposed by the President); Mulford v. Smith, 307 U.S. 38, 46-47, 59 S.Ct. 648, 83 L.Ed. 1092 (1939) (Act does not apply in case involving penalties imposed by Secretary of Agriculture).

.That’s not all. Sections 6301, 6302, and 6303 provide that the IRS must collect any tax that has been assessed pursuant to Sections 6201-6203. Because the IRS's collection duty tracks the IRS's assessment duty, the IRS's collection duty necessarily encompasses all of the penalties that have been assessed by the IRS pursuant to Sections 6201-6203. Given that (i) these Affordable Care Act penalties are taxes for purposes of the IRS's assessment power and (ii) the statute in turn requires the IRS to collect all assessments, it follows that the Affordable Care Act’s penalties are taxes for purposes of the IRS’s collection authority. So plaintiffs' suit, if successful, would prevent the IRS from collecting taxes as defined by Sections 6301, 6302, and 6303. And the Anti-Injunction Act bars suits to restrain the “collection of any *40 tax.” Therefore, plaintiffs' suit is barred by the Anti-Injunction Act for that additional reason as well.

. The majority opinion also suggests that all the penalties in chapter 68 relate to late filing, erroneous reporting, and insufficient payment. But that's inaccurate as well. See, e.g., 26 U.S.C. § 6720A (chapter 68 penalty for sale of diesel fuel that does not meet EPA regulations); 26 U.S.C. § 6720C (chapter 68 penalty for failure to notify health plan of cessation of eligibility for COBRA premium assistance). In any event, the majority opinion's claim on that point is irrelevant because Section 6201 plainly defines taxes to include all assessable penalties "imposed by this title,” not just by chapter 68 of the title.

. Section 7421 of the Code codifies the Anti-Injunction Act. The companion provision, Section 7422, requires exhaustion of administrative remedies for taxpayers who bring tax refund suits. Section 7422 provides: "No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been *41 duly filed” with the IRS. 26 U.S.C. § 7422(a) (emphasis added). Section 7422, by its terms, contemplates that taxpayers who pay tax penalties may challenge those penalties in refund suits against the IRS. The juxtaposition of the Anti-Injunction Act (Section 7421) and the refund suit provision (Section 7422) reinforces the general principle that taxpayers are to pay first and litigate later, including with respect to tax penalties such as those contained in Section 5000A of the Affordable Care Act. See Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962) (Anti-Injunction Act requires "that the legal right to the disputed sums be determined in a suit for refund” and thereby ensures the Government "prompt collection of its lawful revenue”).
It has been suggested that Section 7422’s express reference to penalties might indicate that Section 7421 does not cover penalties, because Section 7421 refers only to taxes. But my analysis of Section 7421 does not rely on the term "tax” in isolation (in which case that critique might have some force). Rather, my analysis relies on two independent and alternative statutory cross-references which make clear that the Affordable Care Act's penalties for failing to have health insurance are taxes for purposes of the IRS's assessment and collection power (Section 6201) and are to be assessed and collected "in the same manner as taxes” (Section 6671).

. Contrary to the majority opinion's suggestion, plaintiffs' complaint seeks to restrain the assessment and collection of the tax penalties. Plaintiffs’ complaint requests "a permanent injunction against the enforcement of the individual mandate provisions.” First Amended Complaint at 26, Mead v. Holder, 766 F.Supp.2d 16 (D.D.C.2011) (No. 1:10-cv-950). Of course, the "enforcement” contemplated by the statute is the assessment and collection of the tax penalties by the IRS. Therefore, the injunctive relief that plaintiffs are seeking to obtain "against the enforcement of the individual mandate provisions” is an injunction barring the IRS from assessing and collecting the Affordable Care Act tax penalties for failing to have health insurance.
The complaint also describes in detail the burden that the Affordable Care Act tax penalties would impose on plaintiffs’ household finances — details supporting plaintiffs' request for injunctive relief against the tax penalty. See id. at 6-16 (stating each plaintiff "will be forced to pay — under strong objection — the annual shared responsibility payment” and estimating each plaintiff's shared responsibility payment for "each taxable year”); id. at 6-16 (each plaintiff is "compelled to adjust” his or her "finances now, by setting aside money, and will continue to do so, to pay the annual shared responsibility payment”); id. at 3 ("The total amount of *42 shared responsibility payments that Plaintiffs must prepare themselves to pay through 2020 may be greater than $27,265 depending upon their income levels during each taxable year and cost of living adjustments.”).

. The Supreme Court has also held that "the constitutional nature of a taxpayer's claim” is of "no consequence under the Anti-Injunction Act.” Americans United, 416 U.S. at 759, 94 S.Ct. 2053. The Court has repeated the same point in several other cases. See, e.g., United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 10, 128 S.Ct. 1511, 170 L.Ed.2d 392 (2008) (“This is so even though the Anti-Injunction Act's prohibitions impose upon the wronged taxpayer requirements” that "the taxpayer must succumb to an unconstitutional tax, and seek recourse only after it has been unlawfully exacted.”); see also United States v. American Friends Service Committee, 419 U.S. 7, 11, 95 S.Ct. 13, 42 L.Ed.2d 7 (1974); Bailey v. George, 259 U.S. 16, 20, 42 S.Ct. 419, 66 L.Ed. 816 (1922).

. The Court has long rejected arguments that a Due Process Clause violation occurs when a statute compels a taxpayer to pay an allegedly unconstitutional or otherwise illegal tax before being able to challenge its legality in a refund suit. See Bob Jones, 416 U.S. at 746-47, 94 S.Ct. 2038 (rejecting university's argument that forcing it to pay some taxes first and then litigate its claim in a refund suit "will deny it due process of law”); see also Phillips v. Commissioner, 283 U.S. 589, 597, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (summary tax collection procedure "satisfies the requirements of due process because two alternative methods of eventual judicial review are available to the” affected party — "bringing an action, either against the United States or the collector, to recover the amount paid”); Dodge v. Osborn, 240 U.S. 118, 122, 36 S.Ct. 275, 60 L.Ed. 557 (1916).
To be sure, the Due Process Clause requires an exception to the Anti-Injunction Act when the tax is so high as to render the purported tax not just a disincentive or civil penalty, but a criminal prohibition. See, e.g., Lipke v. Lederer, 259 U.S. 557, 560-62, 42 S.Ct. 549, 66 L.Ed. 1061 (1922); see also Bob Jones, 416 U.S. at 743, 94 S.Ct. 2038; United States v. One Ford Coupe Auto., 272 U.S. 321, 329, 47 S.Ct. 154, 71 L.Ed. 279 (1926); Graham v. Dupont, 262 U.S. 234, 257, 43 S.Ct. 567, 67 L.Ed. 965 (1923). But otherwise, the Anti-Injunction Act applies to regulatory taxes if the taxpayer's suit would prevent the IRS from assessing or collecting "anyone's taxes.”

. In cases involving state taxes under the related State Tax Injunction Act, a few lower courts have sometimes allowed taxpayers to challenge the regulatory aspect of a regulatory exaction. Three points concerning those State Tax Injunction Act cases: First, this case concerns the federal Anti-Injunction Act, and Bob Jones and Americans United are directly on point in saying that the federal Anti-Injunction Act bars suits that purport to target the regulatory aspect of a federal tax. Second, through its cross-references, the federal Tax Code defines what exactions qualify as taxes for purposes of the Anti-Injunction Act. See 26 U.S.C. §§ 6201, 6671, 5000A. The State Tax Injunction Act does not. So to the extent there’s a difference in case law, that difference stems from the distinct texts and contexts of the two statutes. Third, with respect to the State Tax Injunction Act, a recent en banc Seventh Circuit decision authored by Judge Posner explained in detail why it is wrong even under the State Tax Injunction Act to allow a pre-enforcement challenge to the regulatory aspect of a state tax. See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 651 F.3d 722, 730 (7th Cir.2011).

. The majority opinion tries to attach significance to the different ways that Congress relieved individuals from the mandate. Some are excluded from the definition of "applicable individual” (for example, illegal aliens), and some are “exempt” (for example, low-income individuals). Congress used different methods in part because other provisions of the Act distinguish the different categories. See Patient Protection and Affordable Care Act, Pub.L. No. 111-148, § 1302(e)(2)(B), 124 Stat. 119, 168 (2010) (permitting certain applicable individuals who are exempt from the penalty to enroll in catastrophic health insurance plans). In any event, this argument is a sideshow: No matter how much the majority opinion tries to avoid the point, plaintiffs here (and elsewhere) have sued because they don't want to pay tax penalties for failure to have health insurance. And let’s consider the majority opinion’s rather fanciful hypothetical (which is not presented by this case): If someone who is an "applicable individual” but exempt from the penalties nonetheless wants to challenge the Act, is found to have standing, and prevails, the necessary implication of that litigation victory would be to reduce taxes on those who are not exempt. As the Americans United case made clear, however, the Anti-Injunction Act would still bar such a suit; that case expressly barred a suit that would reduce "anyone's taxes,” even if it would not reduce the plaintiff’s taxes. 416 U.S. at 760, 94 S.Ct. 2053. The majority opinion’s attempt to wring significance out of the different modes of statutory exceptions in the individual mandate provision is valiant but unavailing.

. Bob Jones squarely held that there is no "great harm” exception to the Anti-Injunction Act. 416 U.S. 725, 745, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974). The Court emphasized that Congress is the proper body to create exceptions. And indeed, after Bob Jones, Congress carved out a narrow exception to allow pre-enforcement challenges to the IRS’s determinations of tax-exempt status.

. The Supreme Court has repeated that point many times. See, e.g., Elk Grove Unified School District v. Newdow, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) ("The command to guard jealously and exercise rarely our power to make constitutional pronouncements requires strictest adherence when matters of great national significance are at stake. Even in cases concededly within our jurisdiction under Article III, we abide by a series of rules under which we have avoided passing upon a large part of all the constitutional questions pressed upon us for decision.") (citation, internal quotation marks, and brackets omitted); Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("this Court has re-framed from passing upon the constitutionality of an act of the representative branches unless obliged to do so in the proper performance of our judicial function”) (citation, internal quotation marks, and brackets omitted); Ashwander v. TVA, 297 U.S. 288, 346-47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J„ concurring) ("The Court will not anticipate a question of constitutional law in advance of the necessity of deciding it. It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.”) (footnote, citations, and internal quotation marks omitted); cf. Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); Ex parte Levitt, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937).

. Earlier in this opinion, I explained that the Anti-Injunction Act applies to the tax penalty at issue here because of how the various statutory provisions, cross-references, and definitions in the Tax Code fit together. As the Supreme Court has indicated, the fact that the Anti-Injunction Act applies does not necessarily mean the tax penalty is permissible under the Taxing Clause. Compare Bailey v. George, 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816 (1922) (pre-enforcement challenge to exaction is barred by the Anti-Injunction Act), with Bailey v. Drexel Furniture Co., 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817 (1922) (in refund suit, holding that the same exaction is invalid under the Taxing Clause).
Plaintiffs' suit, if successful, would reduce their payment of taxes (and the tax is not a criminal prohibition such that the Due Process Clause would require a pre-enforcement suit to be available). That's all that’s needed to find the Anti-Injunction Act applicable. That is not necessarily all that’s needed to justify a civil penalty under the Taxing Clause.

. It is true that plaintiffs advance a variety of other arguments why the Affordable Care Act’s penalties for failing to have health insurance cannot be justified under the Taxing Clause. But those alternative arguments all appear to be definitively foreclosed by Supreme Court precedent. First, contrary to plaintiffs' contention, the Taxing Clause authorizes regulatory taxes, at least so long as the tax raises some revenue, as it does here. See United States v. Sanchez, 340 U.S. 42, 44-45, 71 S.Ct. 108, 95 L.Ed. 47 (1950); Sonzinsky v. United States, 300 U.S. 506, 513-14, 57 S.Ct. 554, 81 L.Ed. 772 (1937). Moreover, the fact that an exaction is not labeled a tax does not vitiate Congress’s power under the Taxing Clause. See License Tax Cases, 72 U.S. 462, 471, 5 Wall. 462, 18 L.Ed. 497 (1867) ("The granting of a license, therefore, must be regarded as nothing more than a mere form of imposing a tax, and of implying nothing except that the licensee shall be subject to no penalties under national law, if he pays it."). Nor does it matter that Congress did not explicitly cite the Taxing Clause when enacting the legislation. See Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.”). Finally, neither plaintiffs here nor plaintiffs in the other Affordable Care Act cases have, so far as I am aware, argued that the amount of the Affordable Care Act’s exaction is so high as to be a criminal punishment and thus unjustifiable under the Taxing Clause for that reason. Nor could they. Cf. Dep’t of Revenue of Mont. v. Kurth Ranch, 511 U.S. 767, 778-81, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); Sonzinsky, 300 U.S. at 513, 57 S.Ct. 554.

.At oral argument, counsel for the Government argued that a citizen who refused to obtain health insurance would still be acting lawfully. If that were true, the mandate would presumably pass muster under the Taxing Clause. But it is not evident that the statutory language is fairly susceptible to such an interpretation. That said, perhaps the canon of constitutional avoidance would allow such an interpretation of this provision and thereby squeeze it within the Taxing Clause. Cf. Northwest Austin Municipal Utility District Number One, 129 S.Ct. 2504.

. The Taxing Clause and the Necessary and Proper Clause plainly do support prohibitions and mandates related to compliance with tax reporting, filing, and payment obligations, as opposed to civil penalty provisions imposing prohibitions or mandates on underlying private behavior (for example, a mandate to have health insurance).

. Although the courts have not had occasion to explain this distinction clearly (perhaps because most extant federal prohibitions in the social policy arena have been comfortably authorized by the Commerce Clause), the apparent difference was once cogently described by the Solicitor General: “It may not be easy to draw a line of demarcation between a penalty and a tax, but the line of demarcation seems to be that, where the statute prohibits the doing of an act and as a sanction imposes a pecuniary punishment for violating the act, then it is a penalty, and not a tax at all; but, where the thing done is not prohibited, but, with respect to the privilege of doing it, an excise tax is imposed, it is none the less a tax, even though it be, in its practical results, prohibitive.” Argument of Solicitor General in Bailey v. Drexel Furniture Co., reported in 259 U.S. at 21-22, 42 S.Ct. 449.

. See Office of Tax Policy, Dep’t of the Treasury, Report to the Congress on Penalty and Interest Provisions of the Internal Revenue Code 36 (1999) ("[Pjenalties clearly signal that noncompliance is not acceptable behavior. ... In establishing social norms and expectations, subjecting the noncompliant behavior to any penalty may be as important as the exact level of the penalty.... ”).

. To the extent eliminating the legal mandate language would decrease the incentive to buy health insurance, the amount of the exaction for not having health insurance could be increased (so long as it remains a civil exaction) if that were deemed appropriate to maintain an equivalent incentive.

. Under the Constitution, the President may decline to enforce a statute that regulates private individuals when the President deems the statute unconstitutional, even if a court has held or would hold the statute constitutional. See Freytag v. Commissioner, 501 U.S. 868, 906, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring) (the President possesses "the power to veto encroaching laws or even to disregard them when they are unconstitutional”) (citation omitted). Similarly, Congress may repeal or decline to pass a statute based on its own constitutional interpretation even if the courts have (or would have) upheld the statute as constitutional.
This power does not work in reverse, either for the President or Congress. In other words, the President may not enforce a statute against a private individual when the statute is deemed unconstitutional by the courts. Nor may Congress pass a statute and have it enforced against private individuals simply because Congress disagrees with the Supreme Court. In those situations, the Judiciary has the final word on the meaning of the Constitution. See, e.g., Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); United States v. Eichman, 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990).

. For purposes of this discussion, when referring to the Government’s Commerce Clause argument, I am referring to both the Commerce Clause and the supplementary Necessary and Proper Clause.